**EXHIBIT 2**



United States Department of Agriculture

Farm and Foreign Agricultural Services

Farm Service Agency

Maryland State FSA Office
8335 Guilford Road
Suite E
Columbia, MD 21046

September 1, 2005

John Chott, Jr.
Assistant to the Deputy Administrator
Farm Service Agency
United States Department of Agriculture
1400 Independence Ave, SW
Room 3092-S, Stop 0539
Washington, DC 20250-0539

Dear Mr. Chott:

The purpose of this letter is to respond to Ms. Elizabeth L. Anderson's, State Executive Director, Maryland Farm Service Agency (FSA), August 8, 2005, notice to me proposing disciplinary suspension from duty and pay for a 30 calendar day period.

Thank you for allowing me an opportunity to address Ms. Anderson's allegations. These allegations have come at the most inopportune time of the fiscal year, are an additional drain on limited resources, and do not facilitate the necessary wherewithal to accomplish simple tasks. But most importantly, I find them to be without merit. In addressing the allegations, I will provide a synopsis of my work, achievements, and accomplishments during my tenure with FSA. Additionally, I will include my military experience to show my complete set of skills and abilities that I have mastered and employ in the workplace.

Firstly, during my tenure with the United States Air Force I successfully managed and lead mission impacting projects and programs, and directly supervised up to 50 personnel at any given time. Consequently, I was requested to provide contributory support during major exercises. My technical skills and expertise level allowed me to successfully operate in capacities of disaster preparedness, including first responder, Executive Officer, Public Affairs Officer, and Communication's Officer. In these capacities I communicated with a wide range of top level officials such as colonels, generals and foreign dignitaries; representatives of print and audiovisual media, state and local government agency's, congressional and Pentagon staff.

I was initially employed with FSA as an Administrative Officer. From 2001-2003, I successfully managed and lead administrative programs and staffs in Maryland and Delaware. I successfully worked assignments in both locations. During this time I earned satisfactory ratings while undergoing two major administrative audits within a six-month period. To date, my knowledge, skills, and expertise exhibited in the performance of my duty and responsibilities have earned me two cash awards and one quality step increase.

Mr. John Chott, Jr                                                                                          Page 2

In 2003 a panel of two GS-13 Administrative Officers, a GS-14, and the Maryland SED recommended me for, and I was promoted to, Executive Officer. My ability to manage, lead, and motivate employees earned me the opportunity to detail with FSA's Office of Public Affairs in Washington, DC. While on detail as a specialist dealing with the Freedom of Information Act, I continued to oversee the workflow in the Maryland State Office. I came to the work environment of FSA ready to implement the "do more with less principle" and conducted my duties and responsibilities in exemplary fashion in spite of limited resources.

My performance appraisals from May 10, 2004 to November 1, 2004, signed by Ms. Elizabeth Anderson, shows a rating of "achieved." There were no indications of deficient performance issues. Shortly thereafter, I notified Ms. Anderson of my upcoming within grade increase due on September 5, 2005. She followed my notification with a mid year review dated May 31, 2005. This mid year review is the beginning of Ms. Anderson's attempts to misrepresent my performance. She wrote in the review that my oral and written communications needed improving and I was not a team player. It is ironic that she would indicate a sudden shift in my performance without setting in place a training plan to facilitate improvement. Minimally, I would expect any manager to extend me a one-on-one meeting to discuss a perceived decline in the level of production. Nevertheless, such a meeting did not and has not happened. More confounding is her assertion of me not being a team player when in fact I literally trained her about FSA, her duties and responsibilities, and other inherent workload activities when she came aboard. I spent countless hours training her in all aspects of FSA operations and administrative programs. I worked 12 and 13 hours a day providing guidance and direction to Ms. Anderson as she learned the inter-workings of FSA. And might I add, albeit without overtime compensation.

Prior to Ms. Anderson becoming SED in May of 2004, I received two cash awards and a quality step increase. Those rewards are not consistent with how Ms Anderson portrays my performance. However, they are consistent with exemplary performance such as I have exhibited.

I feel Ms. Anderson has purposed a level of punishment that is not supported by her allegations. There is no record of face-to-face meetings between her and me to discuss my performance. There are no letters of formal counseling or reprimand, nor records of performance improvement plan. Additionally, there is no attempt on behalf of Ms. Anderson to encourage and establish an Individual Development Plan.

John Chott, Jr          Page 3

Lastly, Ms. Anderson motives and actions for the proposed disciplinary actions are unjustified and will not withstand scrutiny. I feel she has purposefully harassed me, created a hostile work environment, and exhibited unfair treatment to me. The kinds of things she has done include 1) calling my counterparts and peers for information that I am responsible to provide her; 2) not communicating pertinent job related information needed to effectively and timely perform my duties; and 3) meeting face-to-face with other supervisors while only communicating with me via e-mails.

The allegations are addressed in the following responses:

**Reason 1**

**Response 1**

We operate on a policy of first come first serve. Accordingly, Ms. Diane Drabish was informed we would make every effort to service her request as soon as possible when her relocation request was submitted to the State Office for processing.

During this time I raised my concerns regarding administrative workload issues with Ms. Anderson in an effort to solicit her support for assistance of providing additional staff. When Ms. Drabish's request came in, I had two employees. Ms. Terrie Butler, Press Operator at a Wage Grade 7, was not trained in performing these duties. Ms. Carolyn Prince, a GS-12 Administrative Officer, was also a member of my staff and assigned to work on the request. On May 4, 2005, she was out on sick live due to illness. Throughout this time I was challenged with numerous time-sensitive workload issues such as unexpected personnel actions, travel claims, vacancies, and other relocations. Nevertheless, no additional staff and resources were provided. In light of Ms. Anderson's response, I continued to forge ahead performing administrative duties while simultaneously performing other priorities given me by her. Consequently, on June 24th the appropriate paperwork was processed and forwarded to FMD requesting that Ms. Drabish be enrolled into the relocation program. Relevant documentation is contained in attachment 1. (See Attachments 2 & 3 for additional information).

**Response 2**

This past May I received an SF-52 signed by Alan Young, Farm Loan Manager, and Thomas Long, District Director, requesting Ms. Diane Drabish be promoted to the GS-9. After review, I determined Ms. Drabish was not eligible for a promotion. (See Attachment 4). The following July, Tom Long emailed me with information that


Exhibit 15 E4
Page 3 of 35

John Chott, Jr                                                                                          Page 4

Ms. Drabish was awarded a WGI to a GS-7 step 2. This was news to me. I was not aware of a pending WGI for Ms. Drabish. As contained in attachment 4, Ms. Drabish was not eligible for a WGI. I addressed this issue with the Administrative Officer and found that it was an administrative error. The error is being corrected.

**Response 3**

Postage meter rental costs and expenses such as supplies, repairs outside the maintained contract, and postage split by the Agencies using the service were billed by FSA for collection until NRCS notified us that they could no longer write checks for postage reimbursement due to the agency new payment system "FFIS". In early 2004, I contacted Kansas City to find out the appropriate method of collecting postage and was told to complete an AD672 with a CAN and MO number. The process was initiated per instructions from Kansas City. However, shifts in workload priorities prevented us from completely setting up a billing collection process. After a thorough review of FY04 and FY05 county office postage reports, the estimated $35,000.00 between NRCS and RD will be billed for collection by the end of FY05.

This is a good example of how Ms. Anderson has consistently changed workload priorities without addressing my concerns about the need for additional staff.

**Response 4**

I approached Ms. Lenz request for relocation with the zest and zeal I handle every other task. Ms. Lenz was offered relocation at the time she was hired. She told us that she was not ready to take advantage of the relocation opportunity at that time. I told her that she should read the "Travel Policy and Procedure Manual" to determine what she was eligible to receive and call me back if she had any questions. As stated in the memo dated November 12, 2004, (See Attachment 5) she was given up to two years to have the Agency relocate her. In May 2005, Ms. Lenz let me know that she needed to move by August 1, 2005. On June 17, I met with Ms. Lenz regarding her relocation (Attachment 6). During that meeting Ms. Lenz was uncooperative, unprofessional, hostile and non-receptive. While I explained her entitlements pursuant to the "Travel Policy and Procedure Manual", her responses were negative as well as her body language. I gave her a second copy of the Travel Policy and Procedure Manual and advised her to read the applicable section. I also told her that because she was a "new hire" from outside of the Federal government some of these regulations did not apply to her situation. Again, in a loud and unprofessional tone she replied, "I am aware of the regulations, but it takes an attorney to decipher the information". As stated in the "Travel Policy and Procedural

John Chott, Jr                                                                                           Page 5

Manual," she was eligible for transportation expenses and en route per diem if travel was over 12 hours, and transportation and temporary storage of household goods and personal effects. Again, Ms. Lenz's response was boisterous, unprofessional and in total disregard to the regulation. She specifically said, "this is not fair, I am only a GS-7 and I cannot afford this expense". I emphatically told her to calm down and encouraged her to work with me to address her concerns. I called the Financial Management Division (FMD) to clear up some of her concerns regarding her relocation options. On June 17th I gave Ms. Lenz the appropriate forms to complete. She was asked to return them as soon as possible in order to satisfy the August suspense date. On June 20, I received an email from her advising me that the forms were in my mailbox in the mailroom. (See Attachment 7) As requested, Ms. Lenz's household goods were relocated by August 1, 2005.

**Response 5**

Standard operating procedure for the administrative section is to process bills within five working days. The first action is my review for duplicates. Next, I sort by county and make copies for my records in order to note the date they are sent to the county offices. County offices are contacted to avoid duplication of bills. This contact is needed because NRCS often times send a copy of the bill to the county office and the state office. My records indicated that I put the bills in question in the outgoing mail on March 31, 2005, (See Attachments 8, 9, 10, and 11).

**Response 6**

The furniture issue was raised during the management staff meeting on April 12, 2005. George Turner, DD, Tom Long, DD, Cheryl Carpenters, FLC, Bebe Shortall, FLS, and other employees were present during the meeting. I specifically asked Ms. Anderson, "what am I to do with the requests that I am getting into the office?" She verbally instructed me during the meeting to continue collecting the requests until she made a decision to address them. In July Ms. Anderson requested a consolidated list of the equipment requests. (See Attachment 12) In early August she approved Queen Anne's County request to purchase conference room furniture for their service center. Thereafter, I worked with the county office staff to order the furniture.

**Reason 2**

**Response 1**

On June 14, 2005, I forwarded Ms. Anderson an email advising her that I would not be able to complete the request by June 14, 2005. I requested additional time to pull

John Chott, Jr                                                                                          Page 6

together all of the information she was requesting. I indicated that the postage records were something that I may not be able to put my hand on right away, but I would make every attempt to find the records dating back to FY02 (See Attachment 13).
Ms. Anderson then informed me that she had collected some of the postage information from the county offices, and she would pursue collecting this information for the other offices.

**Response 2**

On May 25, 2005, I received a memo addressed to Ms. Anderson from Linda Slacum, CED of, Queen Anne's County. The subject was "Request to hire" there were two notes at the bottom of this memo. The first note is from George Turner, District Director, signed May 23, 2005, and the second message was signed by Ms. Anderson. Given the sensitivity of the issue with hiring temporaries, I called Ms. Anderson about 10:30AM to get clarification as to how she wanted me to handle this request. She instructed me to have Linda Slacum proceed with advertising this position, and let her know that a selection should not be made until Sandy Walton was no longer a temporary in Talbot. At this point, I informed Ms. Anderson that our policy in the administrative section is to send county offices a memo, signed by the SED, authorizating them to hire and provide recruitment instructions. A precedence had been set for me to sign on behalf of the SED, however, for this specific situation, I asked her how she would like me to handle the signing of that memo since she was not in the office. Ms. Anderson told me to sign the memo on her behalf and make sure it went out that day. I also asked Ms. Anderson if she wanted me to continue signing routine memo's requiring her signature when she was out of the office. She said yes, sign them. I told her I would always let her know if I needed to sign something during her absence. Ms. Anderson was given a carbon copy of the memo for her records (See Attachments 14, 15, & 16).

In summary, I realize there are going to be challenges in the workplace. The success at meeting challenges depends on a dedicated workforce, led by management willing to motivate and encourage staff to operate at the highest level possible. I contend that the allegations put forth by Ms. Anderson are minor work task that can be handled with her working with me, not against me, in a team approach to move forward the Maryland State FSA Office. I am more than willing to meet with her in order to set in place a structure that is to her satisfaction and that will most importantly create synergy needed to produce timely and efficient results.

I have shown no negligence in executing my duties and responsibilities. On the other hand, I have shown diligence in my work environment despite limited staff resources and support from management. Ms. Anderson's allegations are a smokescreen for her

John Chott, Jr                                                                 Page 7

attempts to discredit my contributions to FSA and smear my professional reputation. None of these allegations are to the magnitude of where the Federal government lost money or employees were subjected to harm or danger.  I request the removal of pejorative language from my mid year performance evaluation.  Additionally, I request appropriate training for all areas of my duties and responsibilities where Ms. Anderson can legitimately substantiate an immediate need for improvement; plus training that can facilitate a level of skills and abilities that will position me on the fore front of what is to come.

Again, thank you for allowing me to address Ms. Anderson's allegations.  I look forward to a favorable reply that will put these allegations to rest and allow us to concentrate on moving the Maryland FSA State Office forward.

Sincerely,

*Pat Hunter*

Pat Hunter
Executive Officer


Attachments