# EXHIBIT 8

WITNESS' AFFIDAVIT

I, (name) __Clarence J. Snyder, III__ (County of): __Queen Anne's__

am an _X_ employee of __ applicant to __ former employee of the U.S. Department of Agriculture:

(Agency) __Farm Service Agency (FSA)__

(County of Agency) __N/A__

(Office) __Washington, D.C Headquarters, Farm Loan Programs__

(Division) __Loan Making Division__

(Branch) __Office of the Director__

Located in (city and state) __Washington D.C.__

In the capacity of (show both your organization title and the classification of your job, if different): __Assistant to the Director/ Senior Loan Officer and Appraiser, GS-1165__

Grade __13 step 8__ between (date) __3/21/2004__ and (date) __Present Date__

My **telephone number during working hours** is: __202-720-0599__

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required (or encouraged) by Federal regulations and Department of Agriculture policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Department of Agriculture. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and Department of Agriculture policy. The Complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

Exhibit __12__
Page __1__ of __10__

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear __X__ affirm _____ the statement which

Page 1 of 10

_CJS_ Initials

follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

I understand my statement is in response to an EEO complaint filed by Ms. Lender "Pat" Hooker-Hunter, Executive Officer, Maryland State FSA Office, on November 3, 2005. I understand the EEO case number is FSA-2005-01116.

I have worked in the Federal Government for 30 years as of July 28, 2006. My initial appointment within USDA began in 1988, with the Farmers Home Administration, of which became FSA in 1995, and of which agency I currently work. I was stationed at USDAs Maryland State FSA Office for approximately seven months (April 2004 to October 2004) prior to my current assignment in Washington DC. During that tenure, I was the Maryland State FSA Office, Farm Loan Chief, and at that time in charge of activities Farm Loan Programs in Maryland and Delaware, with collateral duties as Maryland's Civil Rights Coordinator, Special Emphasis Program Manager, Outreach Coordinator and Recruiting Coordinator. My immediate supervisors while stationed at the Maryland State FSA Office, were Ms. Elizabeth Anderson, State Executive Director (SED), from approximately August 2004 to October 2004, and Mr. Stephen Connelly, SED, from April 2004 until he vacated his position to work in the FSA Washington, DC office some date prior to Ms. Anderson's appointment. I am a white, Caucasian male. I have been involved in prior EEO activity as a Complainant; I too filed against Ms. Anderson. Further, my EEO activity involvement was through my role as the State's Civil Rights Coordinator and Special Emphasis Program Manager, so I was involved in different

Exhibit 12
Page 2 of 10
CP
Initials

EEO related activities. I left the Maryland State FSA Office for my current assignment because of problems that I encountered with Ms. Anderson.

I know Ms. Hunter, Complainant. I met Ms. Hunter when I was assigned to the Maryland State FSA Office, although I had spoken with her prior to my arrival on issues relating to my transfer in. Ms. Hunter was the Executive Officer, and she and her staff provided administrative and personnel support as necessary for me and my staff. Although there was not a formal direct supervisory-subordinate relationship, Ms. Hunter's role as Executive Officer was considered that of a second-in-charge type position at the Maryland State FSA Office, as well as any FSA State level office. I am aware Ms. Hunter is a black, African-American female. I am aware Ms. Hunter participated in prior EEO activity as a Complainant, as well as in association with her role as a Personnel Officer type. Ms. Hunter was also involved in responding to my EEO complaint against Ms. Anderson.

I understand Ms. Hunter raised many issues in this EEO complaint I am responding, however, I can only attest to what I observed or what I am aware of.

Exhibit 12
Page 3 of 10

I am not directly aware of Ms. Hunter's issue regarding other employees being provided staff support while Ms. Hunter's repeated requests for support were denied. However, while I was assigned to the Maryland State FSA Office, other mission areas (except Ms. Hunter's Administrative Section) appeared to be receiving increased staff support. Additionally, as an FSA member that had served as someone seen by agency members as a foremost authority on Farm Loan Program staffing issues through my service as the Project Manager of a Farm Loan Program workload and staffing study, noticed there was a large number (or overstaffing) of federal employees in the farm

CH
Initials

loan programs for Maryland and Delaware compared to other states I had worked and the borrower to loan officer ratio was much lower. The human resources did not appear equitably divided. In short, it was my belief that Maryland was overstaffed by at least three (3) Farm Loan Program Field staff because of it's low case load. Those human capital resources could have been better served if they were available to provide additional staffing to Ms. Hunter's section, assuming she was requesting additional help. Her work unit certainly, appeared to me to be overworked.

I am not directly aware of Ms. Hunter's issue of her receiving negative comments on her mid-year performance evaluation.

I am not directly aware of Ms. Hunter's issue of her supervisor (Ms. Anderson) routinely requesting information from Ms. Hunter's counterparts and not Ms. Hunter. However, I noticed in various management-type meetings, that when Ms. Hunter was involved, that she was ignored by Ms. Anderson and her peers in general. Ms. Anderson tended to place a higher level of credence in District Directors comments and suggestions than in Ms. Hunter, even when Ms. Hunter, I on issues that believed, were within the scope of Ms. Hunter's duties and she was the authority on those particular matters.

I am not directly aware of Ms. Hunter's issue of her supervisor (Ms. Anderson) withholding documents (FSA-875 form) from Ms. Hunter.

I am not directly aware about Ms. Hunter's issue of her coworkers sending her rude emails and management failing to adequately address the matter, in June 2005. However, I can attest to other forms of communication from other staff members to Ms. Hunter that I considered inappropriate. One instance occurred during a merit

Exhibit 12
Page 4 of 10


Initials

promotion interview panel which included me as the EEO Observer, Ms. Hunter, Mr. Tom Long (a District Director), Mr. James A. (Alan) Young and Ms. Anderson. Ms. Hunter was acting as the Personnel Officer or in the capacity of a Human Resource Manager, to ensure information generated during the promotion process was to be treated as confidential and returned to her for proper disposal. She made an announcement at the beginning of the interview outlining the interview process, what to discuss, and what not to discuss, and informed all parties that the materials of the meeting were confidential and private and that all materials would have to be returned to her at the end of the meeting because of personnel rules and laws. I also provided statistical Maryland FSA race, sex and national origin demographics to all members of the panel prior to the meeting to outline EEO staffing shortages based on race, sex and national origin, which concluded that at that time Maryland was extremely understaffed in the category of Asian American male employees. During the meeting, Mr. Long had generated some notes, and when Ms. Hunter asked for them at the meeting's conclusion, Mr. Long engaged in behavior that I interpreted as hostility toward Ms. Hunter and told Ms. Hunter in so many words that he didn't care what Ms. Hunter said about returning documentation that Ms. Hunter wasn't going to get his information. I witnessed Mr. Long making these comments to Ms. Hunter and I believe Mr. Long was out-of-line. Ms. Hunter then turned to Ms. Anderson (Mr. Long's supervisor) and informed her that she needed the documents. Ms. Anderson just sat there; she did not say anything at the time or take any action at that time, even though as I previously stated I believed Mr. Long's comments and actions were so egregious that it merited an immediate and intense response by Ms. Anderson to

Exhibit 12
Page 5 of 10


Initials

curtail the behavior. I understand later Ms. Anderson subsequently met with Mr. Long and that Mr. Long's notes were subsequently shredded in lieu of being provided to Ms. Hunter as required by personnel rules. During this same merit promotion, Ms. Anderson made comments about an Asian American (male) candidate I believed inappropriate on the basis of race. Each candidate was asked a series of questions and graded either 5, 3 or 1 based on the response. The sums of all three interviewers was tallied for each candidate, and discussion was to take place about the top couple of candidates for further consideration and the lower scored candidates would not be part of that consideration any further. The Asian American candidate had scored very low on the overall ratings based on scores provided by the three panel members for interview responses, so the Asian American wasn't a top contender for selection consideration and should have not been a further part of discussion. But, Ms. Anderson began making what I interpreted as discriminatory comments about the Asian American candidate anyway. She said words to the effect that if FSA were seeking selection for a loan officer in the eastern shore area of Maryland where there are a lot of Asian American poultry farmers he would fit in, however given the position was in the dairy area of north central Maryland, where there were no Asian American farmers, she thought there would be a language barrier. To me, as EEO Observer Ms. Anderson's comment was inappropriate, and I brought that to the attention of Ms. Hunter subsequent to the meeting in her role as Executive Officer so she could advise Ms. Anderson on the matter as her Human Resources expert.

Exhibit 12
Page 6 of 10
(initials)

I am not directly aware of Ms. Hunter's issue of her supervisor (Ms. Anderson) emailing her several times while Ms. Hunter was away on military training in July 2005.

I am not directly aware of Ms. Hunter's issue of her supervisor (Ms. Anderson) refusing to discuss work-related information with Ms. Hunter and instead, leaving notes on Ms. Hunter's desk or sending emails. However, just the opposite happened to me. During Farm Loan Program related discussions with Ms. Anderson that weren't directly germane to Ms. Hunter, I made a comment (in Ms. Hunter's presence) at some point, in an attempt to advise Ms. Anderson that Ms. Hunter was the individual she should be seeking for professional guidance to keep her and the District Directors out of trouble. After making that comment, Ms. Anderson's wrath began coming down on me shortly thereafter. Ms. Anderson would not respond to me through emails, and she only spoke to me when she wanted, and asked for and received advice from the National Office to only meet with me with a third party present. I believe Ms. Anderson perceived me as a threat. Towards the end of my tour at the Maryland State FSA Office, Ms. Anderson stopped talking to me entirely, and only as necessary with a third party present. She was only my supervisor for approximately 9-10 weeks or so.

I am not specifically aware of Ms. Hunter's issue of her supervisor (Ms. Anderson) readily believing discrediting statements by the Complainant's coworkers, and then the Ms. Anderson failing to take any action once the discrediting statements were disproved. However, it was common knowledge and through observation, Ms. Anderson took the word of the District Directors over Ms. Hunter,

Exhibit 12
Page 7 of 10

Initials

even if they weren't the experts on a particular area or forum, without ascertaining the truthfulness, or if no investigation or inquiry was accomplished to justify. In fact, one of the District Directors encouraged a change in my area of responsibility, which was outside the scope of his authority to do, and Ms. Anderson acted upon the suggestion; the District Director had no authority to direct the change, but Ms. Anderson took the action anyway, which resulted in a change in the conditions of my employment.

I am not directly aware Ms. Hunter allegation of being harassed (non-sexually). However, I believe Ms. Hunter was disparately treated; Ms. Anderson tended to ignore Ms. Hunter as a professional and allowed the District Directors, in particular Mr. Long, to continue behaving rudely, unprofessional, and in a hostile manner towards Ms. Hunter.

Other then previously addressed, I believe the District Directors were treated differently than Ms. Hunter when applying standards of discipline. One instance involved one of the District Directors, Mr. George Turner (white Caucasian). Mr. Turner illegally allowed through his supervision of the Farm Loan personnel in the Somerset County FSA office to release of about $80,000 plus, and signed the conservation easement document on the remaining unqualified program loan in associated with a debt-for-nature request of a farm loan borrower after being told by the National Office not to release; which was in violation of 7 CFR, Part 1951. The National Office directed the order be reversed, dollars reinstated, and parties involved to receive appropriate personnel action. I understand Ms. Anderson did not take any personnel action against Mr. Turner. However, I understand by third-hand communication that Ms. Anderson suspended Ms. Hunter for thirty-days for allegedly

Exhibit 12
Page 8 of 10

Initials

neglecting her duties and not following instruction, resulting in some loss of government dollars as well. If that is the case, then the measures of discipline are not consistent in my opinion.

    I had requested information (associated with the aforementioned merit promotion incident discussed and Ms. Anderson's comments made therein), through my EEO discovery process, which included requests for statements from Ms. Hunter, Mr. Long, and Mr. Young. Initially, I did not receive any responses and had to go through the EEOC to compel the Agency to provide their statements as previously requested. Although Mr. Long and Mr. Young responded, I understand through Ms. Hunter's comments that she wasn't allowed to respond either times. Mr. Long provided an evasive response and Mr. Young indicated he couldn't recall matters, although he could recall some discussion regarding understanding a candidate.

    I know Ms. Anderson was new to the Federal Government; she was not familiar with the Federal Government and EEO laws in my opinion. However, I found her to be stern and inflexible and would ignore the advice of the experts she had on her staff to guide her through her initial maturing into her beginning exposure to the role.

Page 9 of 10

Exhibit 12
Page 9 of 10

CM
Initials

I have reviewed this statement, which consists of __10__ pages, and hereby solemnly __X__ Swear ____ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____        __July 27, 2006__
(Signature of Deponent)                                              (Date)

Signed before me at (Street and City) __115 Christine Ct., Sudlersville, Maryland__
on this __27th__ day of __July__, 2006.

_____
(Signature of Investigator/Witness)

Page 10 of 10

Exhibit __12__
Page __10__ of __10__


Initials